IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| NAOMI W.,[1] | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 7:20-cv-289 |
| | ) |
| KILOLO KIJAKAZI,[2] | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION

Plaintiff Naomi W. ("Naomi") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. Naomi alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) assess her mental impairments; (2) properly consider her obesity; (3) determine her RFC using a function-by-function analysis; and, (4) assess her allegations regarding her symptoms.

I agree that the ALJ failed to properly evaluate Naomi's obesity in accordance with Social Security Ruling 02–1p and, furthermore, that the ALJ failed to properly evaluate her mental impairments under SSR 96–8p by inadequately explaining the RFC limitation restricting

---

[1] Due to privacy concerns, I am adopting the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

her to no "fast-paced production requirements." Accordingly, I **RECOMMEND GRANTING in part** Naomi's Motion for Summary Judgment (Dkt. 18), **DENYING** the Commissioner's Motion for Summary Judgment (Dkt. 20) and **REMANDING** this matter for further administrative consideration.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Naomi failed to demonstrate that she was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"); see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

limitations would cause him to experience his claimed symptoms during work and if so, how often) (citations omitted).

## **CLAIM HISTORY**

Naomi filed for SSI in August 2016 claiming her disability began on January 1, 2014, due to back issues, degenerative disc disease, migraines, depression, chronic pain, polycystic ovarian symptom and associated obesity, and anxiety R. 192–207, 216, 267. The state agency denied Naomi's applications at the initial and reconsideration levels of administrative review. R. 86–97, 98–111. On January 30, 2019, ALJ Jeffrey Schueler held a hearing to consider Naomi's claims for SSI. R. 48–85. Counsel represented Naomi at the hearing, which included testimony from vocational expert Asheley Wells. On March 21, 2019 the ALJ entered his decision analyzing Naomi's claims under the familiar five-step process[4] and denying her claim for benefits. R. 16–38.

The ALJ found that Naomi had not engaged in substantial gainful activity since her application date and that she suffered from the severe impairments of mild degenerative disc disease of the lumbar spine, osteoarthritis of the knees, asthma, headaches, obesity, history of thyroid cancer, medically induced hypothyroidism, anxiety, and depression/dysthymia. R. 21. The ALJ determined that these impairments, either individually or in combination did not meet or medically equal a listed impairment. Id. The ALJ specifically considered listing 1.02 (major

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

joint dysfunction), 1.04 (disorders of the spine), 3.03 (asthma), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 13.09 (thyroid gland). The ALJ also considered listing 4.00 (cardiovascular system), 5.00 (digestive system), 11.00 (neurological disorders), 12.00 (mental disorders) in evaluating Naomi's endocrine disorder per Titles II & Xvi: Evaluating Endocrine Disorders Other Than Diabetes Mellitus, SSR 14–3p,[5] 2014 WL 2472009 (June 2, 2014). Finally, the ALJ considered Social Security Ruling 02–1p. Soc. Sec. Ruling 02–1p Titles II & Xvi: Evaluation of Obesity,[6] SSR 02–1p, 2002 WL 34686281 (S.S.A. Sept. 12, 2002). The ALJ found that regarding her mental impairments, Naomi had moderate limitations in interacting with others and concentrating, persisting, or maintaining pace, a mild limitation in adapting or managing oneself, and no limitation in understanding, remembering, and applying information. R. 23–25.

The ALJ concluded that Theresa retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 25. Specifically, Naomi can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. Id. Naomi should avoid concentrated exposure to cold, noise, and vibration, and even moderate exposure to pulmonary irritants, chemicals, or hazards (e.g. moving machinery or heights). Id. Naomi requires a low-stress job (that has only occasional decision-making or changes in the

---

[5] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

[6] In May 2019, the Social Security Administration rescinded and replaced SSR 02-1p with SSR 19-2p. Soc. Sec. Ruling 19-2 Titles II and Xvi: Evaluating Cases Involving Obesity, SSR 19-2p, 2019 WL 2374244 (S.S.A. May 20, 2019). The ALJ issued the decision in this case in March 2019, before the new rule. The old rules contained in SSR 02-1p therefore apply. See Williams v. Saul, No. 1:19-cv-983, 2020 WL 5802707, at *5 n.2 (E.D. Va. Sept. 29, 2020).

work setting) in a work environment free of fast-paced production requirements with only occasional interaction with the public or co-workers. Id. The ALJ determined that Naomi is unable to perform any past relevant work, but she could perform jobs that exist in significant numbers in the national economy, such as assembler and laundry worker. R. 36–37. Thus, the ALJ determined that Naomi was not disabled. R. 38. Naomi appealed the ALJ's decision and the Appeals Council denied her request for review on March 7, 2020. R. 1–4.

## ANALYSIS

Naomi alleges that the ALJ failed to properly assess her mental impairments, consider her obesity, determine her RFC using a function-by-function analysis, and assess her allegations regarding her symptoms. Pl.'s Br. at 29–48.

### A. Medical History Overview

Physical Impairments

Prior to her alleged onset date, Naomi was diagnosed with morbid obesity refractory to multiple weight loss attempts with co-morbidities. R. 979. Throughout the relevant period Naomi's body mass index ("BMI") ranged between 53.16 and 69.79.[7] Pl.'s Br. at 39, Dkt. 19; R. 1119. Her providers often explained the impact her weight had on her other health conditions, and they regularly advised her to lose weight. See, e.g., R. 377, 492, 1103, 2276. Naomi often requested bariatric surgery throughout this period; however, she was not recommended for the surgery due to her extreme weight and mental health conditions. R. 388, 419–23, 943, 1757. Her providers reiterated that she needed to lose weight before they would recommend her for

---

[7] SSR 02-1p relies on the National Institutes of Health (NIH) obesity guidelines. The NIH guidelines classify obesity according to BMI, and a BMI of 30.0 or above qualifies as obese. The NIH guidelines further recognize three levels of obesity. "Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, terms 'extreme' obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40." SSR 02–1p, 2002 WL 34686281. The levels do not necessarily correlate with any specific degree of functional loss. Id.

surgery, often suggesting weight loss through conservative measures including exercise, diet, and physical therapy. See, e.g., R. 311, 950. Naomi reported regular attempts to lose weight through diet modification and exercise but was unsuccessful and some providers discussed noncompliance with their recommendations. See R. 943, 2374.

In June 2016, Naomi complained of persistent back pain. Her attending physician advised her to engage in conservative lifestyle changes and physical therapy. R. 561. X-rays of Naomi's back showed some degenerative change, disc height loss, and spondylosis. R. 549–50. Naomi followed-up in August 2016, continuing to complain of back pain. Her treating physician, Natalie Klawonn, M.D., explained that Naomi's back pain was likely related to her weight and concluded no MRI was needed. R. 965. Naomi requested a second opinion, however, and Dr. Klawonn referred her. Id. At her referral, the referral physician diagnosed her with lumbar degenerative disc disease, but he noted that imaging showed normal segmentation and no acute fracture. R. 947. She recommended physical therapy, medication, and injections for pain management. Id.

Naomi attended regular, monthly pain management appointments for her back complaints between late 2016 and 2017. R. 1529–64. At these appointments, Naomi received medication and facet joint nerve block injections. See, e.g., 1531, 1536, 1542 (injections); see, e.g., 1533, 1538, 1543 (medication). She generally reported that the injections provided some short-term reduction in pain. R. 1534. In February 2017, Naomi underwent a right facet rhizotomy, a procedure used to permanently destroy nerve fibers. R. 1529. Naomi reported an inadequate response. R. 1556. In May 2017, Naomi had further imaging on her back. R. 1723. X-rays showed minimal lower thoracic spondylosis and some disc bulging; her results were otherwise unremarkable. R. 1723–27.

In July 2018, Naomi was referred to the Chronic Pain Management Clinic for further evaluation of her low back pain. At this referral, Naomi declined several conservative measures suggested, including physical therapy and nutrition courses. R. 2269. Her attending physician treated her with medication. Id. In August 2018, Naomi presented at the emergency room and reported pain radiating from her chest to her back. R. 2344. Her physical exam was normal and the pain largely resolved itself by her follow-up appointment. R. 2348, 2350.

During this same period, Naomi complained of left knee pain. See, e.g., R. 388, 1569, 1572, 1978. In October 2016, Naomi complained of painful grinding in her knee. R. 275. Physical exam revealed malalignment, and her physician recommended weight loss, supplements, and medication. Id. Imaging at this appointment revealed no evidence of fracture, dislocation, or bony pathology. Id. In April 2017, Naomi reported knee pain and leg swelling. R. 1569. Naomi's physician concluded that she strained her knee and recommended conservative treatment, including elevation and medication. R. 1572. Medical records throughout 2018 indicate that Naomi presented with a left knee-limp and continued to report knee and leg pain. See, e.g. 2322, 2354.

Naomi began presenting with thyroid issues in 2017 after physicians found a nodule within her thyroid lobe. R. 1636. Her physician recommended a non-emergency aspiration. R. 1874, 1968, 1972. Naomi underwent a left thyroidectomy in December 2017 and her treating physician found papillary thyroid carcinoma. R. 1968, 2016–17. At Naomi's request she then had a completion thyroidectomy in February 2018. R. 2016. Naomi tolerated both procedures well and without complication, however, she complained of chronic fatigue at appointments following her thyroidectomy. R. 2118, 2163, 2194. Naomi had previously complained of fatigue

at several 2016 appointments, but she had not regularly complained of fatigue in the year leading up to her thyroidectomy. R. 1764, 1846.

Naomi also complained that she suffered migraines and headaches and attended several appointments in 2017. R. 1573–1747. CT scans and neurological exams were unremarkable, however, Naomi's neurologist noted that her headaches occurred at a frequency requiring a preventative strategy and medication. R. 1647, 1747. In February 2018, Naomi presented to the emergency room, complaining of multi-day migraine symptoms. R. 2033, 2044. Naomi stated that her medication, which generally moderated her symptoms, currently provided no relief. R. 2044. The attending physician reported that Naomi's symptoms improved over time and she was released with instructions to follow-up with her neurologist. Id. At a September 2018 appointment Naomi again complained of multi-day headaches and the attending physician modified her medication regimen. R. 2085.

Mental Impairments

Naomi attended several psychiatric appointments with Tracey Criss, M.D., in 2016. See, e.g., R. 301–15. Dr. Criss diagnosed Naomi with major depressive disorder, borderline traits/mood lability, insomnia, and morbid obesity and treated Naomi with medication. R. 311, 313. Naomi reported mood swings, depression, and issues with energy, but reported some relief from the medication as related to her depression. See R. 311. At these appointments, Dr. Criss performed mental status examinations and found that Naomi's mental state, despite some issues with mood, was largely normal. See R. 309, 311, 314–15.

Naomi also attended three psychosocial evaluations in 2016 as part of the clearance process for potential gastric bypass surgery. R. 306–08, 419–22, 1027–30. The evaluating physicians found that Naomi suffered conditions including major depressive disorder and

anxiety; one physician suggested that she engage in psychotherapy. R. 307, 1030. The evaluating physicians each recounted Naomi's psychiatric history, describing childhood trauma as well as current issues, including feelings of helplessness regarding her weight, her tendency to reject authority, and general difficulties with "stressors, coping ability, and finances." R. 422. She was ultimately rated a poor candidate for bariatric surgery due to her weight and her unstable mood. Id.

Medical Opinion Evidence

State agency physician Patricia Staeher, M.D., reviewed the record in March 2017 and found Naomi capable of sedentary work with exertional, postural, and environmental limitations. R. 92–93. Dr. Staeher found Naomi could sit approximately six hours and stand or walk two hours in an eight-hour workday. R. 92. The ALJ gave Dr. Staeher's opinion some weight, but he did not agree with her standing and walking limitations. R. 35. State agency psychologist Howard Leizer, Ph.D., also reviewed the record in March 2017 and concluded that Naomi's mental condition was non-severe and resulted in no more than mild functional limitations. R. 91. Specifically, Dr. Leizer found Naomi had no limitation in her ability to understand, remember, or apply information and mild limitations in her ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. Id. The ALJ gave Dr. Leizer's opinion little weight. R. 35.

On reconsideration in June 2017, state agency physician James Darden, M.D., found Naomi capable of sedentary work, noting similar exertional, postural, and environmental limitations, but concluded she could stand and walk up to four hours per day. R. 107. The ALJ gave Dr. Darden's opinion some weight, noting he did not agree with his standing and walking limitations. R. 35. State agency psychologist Patricia Bruner, Ph.D., also reviewed the record in

June 2017, noting that Naomi's mental condition was non-severe and that she had mild limitations only in her ability to interact with others and concentrate, persist, or maintain pace. R. 105. The ALJ gave Dr. Bruner's opinion little weight.

### B. Obesity under SSR 02-1p

Naomi alleges that the ALJ failed to properly evaluate her obesity in accordance with SSR 02-1p. Pl.'s Br. 38–42, Dkt. 19. Specifically, Naomi argues that the ALJ failed to consider her obesity in conjunction with her other impairments when assessing her RFC at steps four and five of the five-step process.

SSR 02-1p requires that an ALJ evaluate the effect a claimant's obesity has, both alone and in conjunction with other impairments, on her ability to perform work-related activities, at steps two through five. SSR 02–1p, 2002 WL 34686281. The regulations acknowledge that obesity may compound the effects of other impairments:

> Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's [RFC], adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(Q); see also SSR 02–1p, 2002 WL 34686281; James P. v. Saul, No. CBD–18–1486, 2019 WL 3892330, at *3–5 (D. Md. Aug. 19, 2019) (explaining requirements for evaluating obesity at steps two through five).

Here, the ALJ found obesity to be a severe impairment, and in his step 3 analysis, stated that he considered Naomi's obesity in relation to other body systems listings as required by SSR 02-1p. R. 21–22. He concluded "that the medical evidence d[id] not support a finding that

[Naomi's] obesity has reached a level that would cause the other impairments to meet or medically equal a listed impairment." R. 22.

Though the ALJ stated he considered the cumulative effects of Naomi's obesity, there is no direct indication of this in his decision. Neither the RFC nor his step four or five analysis directly consider the cumulative effects of Naomi's obesity. See R. 25–38.

This near total failure to examine the effects of Naomi's obesity is problematic. Naomi specifically argues that her obesity, in combination with other impairments, impacts her functional ability to walk, sit, and stand. Pl.'s Br. at 42, Dkt. 19. At the hearing, Naomi generally testified that she suffered back pain and further noted that her back frequently gave out on her, making it difficult to stand and walk.  R. 68–69, 74–75. The medical evidence further supports Naomi's contention. The treatment records show that Naomi's treating physicians often linked Naomi's obesity to her back pain, noting that her weight placed additional strain on her spine. See, e.g., R. 492 (finding back pain is likely related to excessive weight); R. 561 (describing "weight loss [as the] cornerstone" to resolving back pain); R. 1103 (describing that back and abdominal pain were likely musculoskeletal and weight loss would assist); R. 1108, 1815 (noting obesity placed additional strain on Naomi's joints, muscles, and spine).

The ALJ briefly considers Naomi's degenerative disc disease and back condition, stating that while she "exhibited a decreased and painful range of motion in her lumbar spine, the medical records also do not contain notes that [she] exhibited difficulty initiating movement, difficulty moving generally, or muscle tremors." R. 35. This analysis shows that the ALJ considered Naomi's back condition, but it does not indicate, directly or otherwise, that he considered the cumulative effect of Naomi's "extreme" obesity. Viewing the decision as a whole, there is similarly no indication that the cumulative effects of obesity were considered—

11

other than the ALJ's step three statement to that effect. For instance, the decision includes no direct reference to Naomi's obesity or BMI in steps four or five; at most, the ALJ references Naomi's weight fluctuation. See R. 25–38; Kimberly W. v. Comm'r, 4:19–cv–00023, 2021 WL 827075, at *3 (W.D. Va. Mar. 3, 2021), adopted by, 2021 WL 1232101 (W.D. Va. Mar. 31, 2021) (remanding where ALJ found obesity to be a severe impairment, discussed obesity at step three, and included some references to plaintiff's BMI and weight fluctuation in reviewing the medical evidence, but otherwise failed to analyze the cumulative effects). Likewise, there is no indication that the ALJ considered Naomi's obesity at the administrative hearing. R. 48–85. While Naomi and her attorney referenced her weight, BMI, and obesity, the ALJ asked Naomi no follow-up questions about her obesity and did not directly discuss the potential cumulative effects with the vocational expert. Id.

    While true that the ALJ is not required to include a detailed analysis regarding a plaintiff's obesity, he must at least consider it. See Richards v. Astrue, No. 6:11cv17, 2017, 2012 WL 5465499, at *6 (W.D. Va. July 5, 2012) ("[T]here is no language in SSR 02-1p that directs the ALJ to include a lengthy analysis, or indeed, any precise analysis regarding obesity when issuing an opinion. It only mandates that the ALJ consider the effect of obesity during steps two through five of the five-step inquiry."). Here, I am left with questions whether Naomi's obesity was considered, especially in light of the ALJ's failure to directly discuss Naomi's obesity at the hearing and his failure to mention, even briefly, how he weighed and considered cumulative effects, other than general reference to the medical evidence at step three. Kimberly W., 2021 WL 827075, at *3, adopted by, 2021 WL 1232101.

    This is all the more important given that the ALJ explicitly rejected the state agency physicians' opinions regarding Naomi's ability to stand and walk. R. 35. The state agency

physicians concluded that Naomi was capable of only sedentary work, finding she had exertional limitations stemming, in part, from her obesity. R. 92–93, 106–07. The ALJ found Naomi capable of light work with postural limitations. R. 25. He included no exertional limitations in the RFC. Id. The ALJ explained this partial rejection of the state agency physicians' opinions, noting that they relied on Naomi's subjective complaints, which were out of proportion with the objective evidence. R. 35. His analysis does not indicate he considered the cumulative effects of Naomi's obesity. I am therefore left not only with questions whether he considered the effects of Naomi's obesity but also whether the less restrictive RFC accounts for Naomi's obesity-related exertional limitations.

Naomi's BMI placed her in the "extreme" range of obesity throughout the relevant period. She asserts that "[t]he combination of [her] impairments, including obesity, have resulted in a severe restriction in [her] ability to sit, stand, walk, or lift weight." Pl.'s Br. at 42, Dkt. 19. Nevertheless, the ALJ's decision does not adequately indicate that he considered the relationship between Naomi's obesity, her impairments, and their effect on her functional abilities. This court is, therefore, unable to determine whether substantial evidence supports the ALJ's determination.

### C. Medical Impairments Under SSR 96–8p

Naomi argues that the ALJ failed to properly assess her mental impairments as required by SSR 96–8p. See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96–8p (S.S.A. July 2, 1996). Specifically, Naomi asserts that the ALJ erred by failing to properly address her ability to sustain work over an eight-hour workday and explain the RFC limitation finding her incapable of "fast-paced production requirements." Pl.'s Br. at 31, Dkt. 19.

SSR 96–8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10–cv–

13

2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8P at *7; Meadows v. Astrue, No. 5:11–cv–63, 2012 U.S. Dist. LEXIS 115150, at *24, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9–cv–2545, 2010 U.S. Dist. LEXIS 132972, at *15–16 (D. Md. Dec. 15, 2010)); Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an appropriate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often); Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020) (underscoring ALJ's duty to adequately review the evidence and explain the decision).

The ALJ must build a logical bridge between the limitations he finds and the vocational expert evidence relied upon to carry the Commissioner's burden at Step Five. Carline S. v. Berryhill, TMD–17–3094, 2018 WL 4914233, at *5 (D. Md. Oct. 10, 2018). The Commissioner employs vocational experts to offer evidence as to whether a claimant possesses the RFC to meet the demands of past relevant work or adjust to other existing work. 20 C.F.R. §§ 404.1560(b)(2). "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006) (quoting Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989)). "[A] hypothetical question is unimpeachable if it adequately reflects a [RFC] for which the ALJ had

14

sufficient evidence." Fisher v. Barnhart, 181 F. App'x 359, 364 (4th Cir. 2006) (quoting Johnson, 434 F.3d at 659.

Naomi challenges the ALJ's use of the term "fast-paced production requirements," noting that the ALJ did not properly define the term. Pl.'s Br. at 31, Dkt. 19. She relies on the Fourth Circuit's opinion in Thomas v. Berryhill, 916 F.3d 307 (4th Cir. 2019), to support her argument that the ALJ's use of the term is a basis for remand. Id. In Thomas, the Fourth Circuit found that meaningful appellate review of an ALJ's RFC was frustrated, in part, where an ALJ limited Thomas to no work "requiring a production rate or demand pace." Thomas, 916 F.3d at 312. The Fourth Circuit found that the ALJ did not provide "enough information to understand what those terms mean," and specifically noted:

> [The lack of definition] makes it difficult, if not impossible, for us to assess whether their inclusion in Thomas's RFC is supported by substantial evidence. The Commissioner contends that "production rate" and "demand pace" are "common vocationally relevant functional limitations." But those terms appear in a vanishingly small number of Social Security cases involving RFC evaluations . . . We therefore disagree with the Commissioner: the terms do not seem to be especially common—certainly not common enough for us to know what they mean without elaboration.

Id. Following Thomas, the Fourth Circuit found in Perry v. Berryhill, 765 F. App'x 869 (4th Cir. 2019), that remand was required where a RFC assessment limited Perry to unskilled work in "non-production oriented work setting." Perry, 765 F. App'x at 872–73. The Fourth Circuit found found that "non-production oriented work setting" was not defined in the regulations or by case law and was not otherwise self-explanatory. Id. Further, the ALJ failed to offer an explanation for that phrase, and therefore the Court found that it remained "uncertain as to what

15

the ALJ intended" and could not "meaningfully assess whether there was a logical bridge between the evidence in the record and the ALJ's conclusion."[8] Id.

Courts have analyzed the term used here, "fast-paced production," using the Thomas and Perry framework. See, e.g., Christopher M.H. v. Comm'r, ADC–19–655, 2020 WL 2556563, at *5 (D. Md. May 20, 2020). These courts generally allow ALJs to use "fast-paced production" and other like terms so long as the ALJ provides a clear definition for the term. See, e.g., Teresa B. v. Comm'r, No. SAG–18–2280, 2019 WL 2503502 (D. Md. June 17, 2019); Jackie v. Comm'r, DLB–18–3883, 2019 WL 5960642 (D. Md. Nov. 13, 2019). However, when an ALJ fails to provide a definition, courts typically conclude that there is no logical bridge between the evidence and the ALJ's conclusion. See, e.g., Christopher M.H., 2020 WL 2556563, at *5; Crystal O. v. Saul, TMD–20–948, 2021 WL 1087077, at *4–5 (D. Md. Mar. 22, 2021).

Here, the ALJ failed to provide a definition or satisfactory explanation to serve as a "logical bridge" to clarify the meaning of his use of the term "fast-paced production requirements." At Naomi's hearing, the ALJ asked the vocational expert to consider the following hypothetical:

> [If we added into the prior hypothetical] that the individual needs a low-stress job and I'll define low stress as a job that has only occasional decision making and only occasional changes in the work setting; they need a job with only occasional interaction with the public or with coworkers; and they need work in an environment free of fast-paced production requirements. If we had it – those types of limitations in place, would such an individual – would that alter your responses to the first or second hypothetical?

R. 81. The ALJ and vocational expert ("VE") then continued to have a discussion regarding the fast-paced production requirement, stating:

---

[8] Later courts have read Perry to "support[] the proposition that a case can be remanded when the sole error of the ALJ is the failure to define "non-production oriented work setting" or a like term. See Ursula G. v. Comm'r, SAG–18–1841, 2019 WL 2233978, at *3 (D. Md. May 23, 2019); Margaret S. v. Saul, CBD–19–2492, 2020 WL 7319334, at *11 (D. Md. Dec. 11, 2020).

> ALJ: [How would the requirements reduce the number of positions?]
> VE: Some assembly jobs are fast-paced production. Others are not quite so fast-paced. There is a quota for these kinds of positions and so roughly by half. I can cite others if you'd like me to. Okay.
> ALJ: That's fine. I think so would I be accurate in saying that based on those additional limitations, the assembler and laundry worker for the light RFC, the first hypothetical would remain in place –
> VE: That's right.
> ALJ: -- given these additional limitations?
> VE: That's correct, Your Honor.
> ALJ: But for the second hypothetical the addressing clerk and the weight tester, same jobs would be available but the numbers would be reduced because of the fast pace?
> VE: Actually, I'm sorry, it's the assembler and the weight tester. The – that would –
> ALJ: Okay.
> VE: -- be the production –
> ALJ: I'm sorry.
> VE: -- ones.
> ALJ: Okay. Well, actually, there's a bit of reduction on both sides –
> VE: Correct.

R. 81.

The Commissioner argues that the ALJ adequately explained the term "fast-paced production," specifically noting that the ALJ's inclusion of "low stress" in the RFC clarified his meaning, that the ALJ and VE discussed and understood the term, and finally, that Naomi doesn't articulate what, if any, additional limitations would be required that were not accounted for in the RFC.

The inclusion of the term "low stress" does not necessarily remedy the ALJ's failure to define fast-paced production requirement. See Sarah N.W. v. Saul, 5:19–cv–81, 2021 WL 668774 (W.D. Va. Feb. 19, 2021) (remanding for failure to define fast-paced production work where ALJ included "low stress" limitation in the RFC); Danny S. v. Saul, 5:19–cv–74, 2021 WL 263370, at *2, 4 (W.D Va. Jan. 27, 2021) (remanding for failure to define no production rate work where ALJ included "low stress" environment limitation in the RFC).

Similarly, the repeated references to fast-pace between the ALJ and VE at the hearing do not adequately clarify its meaning. See Danny S. v. Saul, 2021 WL 263370, at *4 (finding discussion between claimant and ALJ using term no production rate did not clarify). More importantly, the discussion between the ALJ and the VE does not cure the issue "[e]ven if 'the [VE's] testimony does not evince any confusion about the terms of the hypothetical, [since] the court has an independent duty to determine if the ALJ supported his findings with substantial evidence." Crystal O. v. Saul, 2021 WL 1087077, at *4–5 (citing Taishika C. v. Saul, Civ. No. DLB-19-1994, 2020 WL 2994487, at *3 (D. Md. June 4, 2020)). And here, "[t]he court cannot decisively say that, had the ALJ defined or explained the term 'fast-paced production requirements,' the VE would have identified the same, or any, positions that the hypothetical person could perform." Lonie B. v. Comm'r, DLB-19-1424, 2020 WL 2097683, at *5 (D. Md. May 1, 2020).

Finally, the court cannot determine whether substantial evidence supports the ALJ's discussion of Naomi's mental conditions sufficiently supports the RFC as there is no explanation of the term. See Linda S. v. Saul, DLB-19-661, 2020 WL 3268535 (D. Md. June 17, 2020) (remanding where Commissioner argued that the ALJ's discussion of plaintiff's mental limitations sufficiently supported the RFC). See also Ursula G. v. Comm'r, SAG–18–1841, 2019 WL 2233978, at *3 (D. Md. May 23, 2019) ("[T]he lack of a definition of production pace is an issue separate and apart from whether the ALJ adequately accounted for a claimant's limitations in concentration, persistence, or pace"); Margaret S. v. Saul, CBD–19–2492, 2020 WL 7319334, at *11 (D. Md. Dec. 11, 2020) (same).

Accordingly, the ALJ here erred by failing to define fast-paced production work at the hearing and thus presented an improper hypothetical to the vocational expert.

18

Remand is necessary to provide a proper definition to the term fast-paced production work and to create a logical bridge between the evidence and the ALJ's conclusion. In light of this basis for remand, the court need not discuss Naomi's remaining allegations of error. See Boone v. Barnhart, 353 F.3d203, 211 n. 19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments).

## CONCLUSION

For the foregoing reasons, I **RECOMMEND GRANTING in part** Naomi's motion for summary judgment, **DENYING** the Commissioner's motion for summary judgment, and **REMANDING** this case pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

The Clerk is directed to transmit the record in this case to James P. Jones, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation which must be filed within fourteen (14) days hereof.  Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties.  Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including a waiver of the right to appeal.

Entered:  August 2, 2021

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge